UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. S2-4:18CR380 RWS/NCC |
| | ) | |
| LEROY SHIPP and | ) | |
| STEPHON WRIGHT, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM, AND REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE -ELECTRONIC EVIDENCE MATTERS**

The above matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

**PROCEDURAL BACKGROUND AND FINDINGS OF FACT**

On November 1, 2018, defendants Leroy Shipp and Stephon Wright were charged in a multi-count Second Superseding Indictment with four other defendants.[1]  Defendants Shipp and Wright are charged with a conspiracy that alleges the sale and distribution of heroin, in excess of one kilogram.  Defendant Shipp is also charged with possession of a firearm in furtherance of a drug a trafficking crime and being a felon in possession of a firearm.

---

[1] This is a complex case involving several co-defendants.  [ECF No. 124].  Judgment has been entered as to Defendant Kenneth Woods.  Defendants Bryan K. Johnson, Demetris Coleman and Melvin T. Cunigan have waived their right to file pretrial motions.  The pending pretrial motions filed by co-defendants Shipp and Wright are scheduled in phases.

Defendants Shipp and Wright have each filed pretrial motions.[2]  On October 29 and November 1, 2019, hearings were held on Defendant Shipp's Motion to Suppress Evidence of Pen Registers, Wiretaps and Electronic Communications of any Nature [ECF No. 251]; and Defendant Wright's Motion to Suppress Electronic Surveillance [ECF No. 246].  Written transcripts of the hearings have been prepared and filed and the undersigned has relied upon those transcripts to make findings of fact [ECF Nos. 292, 293].  Following the hearings, the parties were permitted to file supplemental briefs and memoranda addressing the issues raised in Defendants' motions to suppress evidence obtained by means of electronic surveillance [ECF Nos. 290, 294, 296 and 297].  Based on a review of each of the challenged Orders and Warrants, the relevant law, the testimony at the hearing, and having considered the parties' arguments and written briefs, the undersigned makes the following findings of fact, conclusions of law and recommendations.

The government applied for and obtained numerous court orders authorizing various forms of electronic surveillance.  These orders include three Title III wiretap orders, phone location warrants, and pen registers.[3]  The parties stipulated to the admissibility of the government's evidence for the purposes of the hearing.  The parties also agreed at the first hearing that defendant Shipp was not intercepted over the first Title III wiretap obtained in this case and that he likely does not have standing to challenge the admissibility of this Title III wiretap evidence as an aggrieved person under the statute.  In his post-hearing briefs it seems that defendant Shipp has changed his mind and he now makes a summary motion to suppress all

_____

[2]The Court appointed attorney Larry Hale to serve as CJA counsel for defendant Wright until his untimely death.  The undersigned thereafter appointed Peter Cohen to represent defendant Wright who did not file any additional pretrial motions on Wright's behalf.

[3]The government also used a pole camera and a triggerfish device during this investigation.

2

evidence obtained from TT#1, TT#2 and TT#3. [ECF No. 294].  Accordingly, these findings of fact and conclusions of law apply equally to Shipp and Wright.

The following Title III orders are challenged by Defendants:

1.      Wiretap Order for (314) 665-8420 (TT#1); 4:17 MC 00342 AGF (Order dated June 19, 2017; Gov't Exh. 45);

2.      Wiretap Order for (314) 261-6568 (TT#2); 4:17 MC 00460 JAR (Order dated July 26, 2017; Gov't Exh. 54); and

3.      Wiretap Order for (314) 574-0047 (TT#3); 4:17 MC 00632 HEA (Order dated October 20, 2017; Gov't Exh. 63).

Shipp and Wright contend that the evidence obtained pursuant to each of the challenged Wiretap Orders must be suppressed because the accompanying applications, affidavits, and orders lack probable cause and failed to satisfy the necessity requirements of Title III.  *See* 18 U.S.C. §§ 2518(1)(c), (3)(c).  Shipp further claims that the government failed to follow reasonable minimization procedures and they both cite to *Franks v. Delaware*, 438 U.S. 154 (1978).[4]  On October 29, 2019, the parties proceeded by way of testimony at the hearing and the undersigned has also considered the four corners of the electronic evidence orders submitted in this case. DEA Special Agent David Wilmsmeyer testified for the government and he explained his role in the investigative team that executed the affidavits and applications for wiretaps submitted to the Court to monitor Target Telephone #1 (TT#1), Target Telephone #2 (TT#2) and Target Telephone #3 (TT#3).  The government introduced an extensive list of exhibits pertaining to the pen registers, precision location warrants, and wiretap materials detailing minimization instructions, 10-day reports and sealing orders.  A copy of the pretrial hearing exhibit list is attached to this Report and Recommendation.

---

[4] Wright's motion cites to *Franks* but he does not claim any false statement or deliberate omissions in the affidavits that mislead the issuing judges.

The parties questioned Special Agent Wilmsmeyer who testified about his ten years of experience with the DEA as a special agent and task force officer.  Agent Wilmsmeyer explained his general understanding that law enforcement agents often began such investigations by using methods like a triggerfish device to obtain IMSI and ESN numbers associated with specific cell phone numbers, then they make subpoena requests for historical toll data or they seek a pen register.  Agent Wilmsmeyer explained that a triggerfish device is used to ensure that investigators do not inadvertently capture devices carried by an individual other than the target. They follow the target to ensure that the person is alone to different locations to isolate the devices that might be traveling with the targeted person.  A precision location warrant gathers information including the movement of the device and the user's movements to assist in establishing a pattern to show the proximity of a specific device to other users.  Investigators need to obtain a pen register with an audio interception to proceed to the next step toward a wiretap, if it is a viable option.  He presented an affidavit and application for initial interception of wire and electronic communications over TT#1, TT#2 and TT#3 with AUSAs Sirena Miller Wissler and Beth Orick for this case.

On June 19, 2017, AUSA Miller Wissler appeared before the Honorable Audrey G. Fleissig, United States District Judge, and submitted an Application for Initial Interception of Wire and Electronic Communications over telephone number (314) 665-8420, which was referred to in the application, affidavit, and order as Target Telephone #1 (TT#1) (Gov't Exhs. 45-47).  The application for TT#1 was accompanied by an affidavit of S/A Wilmsmeyer, which was signed and sworn to before Judge Fleissig on June 19, 2017.

Agent Wilmsmeyer's affidavit represented that he and a team were investigating a heroin drug trafficking conspiracy involving Shipp, Wright and others.  The affidavit stated that

4

communications between members of the conspiracy were expected over TT#1, which was used by T. Johnson[5] and subscriber unknown.  The affidavit anticipated that Shipp and Wright would be intercepted and included a detailed probable cause statement supporting the application, and a summary of some pertinent communications and events.  For example, investigators observed Shipp multiple times to be sitting in his pickup truck and watching the block where heroin sales related to the drug trafficking conspiracy were thought to have occurred because he was involved as a source of supply. The investigation identified Shipp as someone they believed to be involved in supplying T. Johnson and his organization with heroin.  Investigators conducted surveillance of Shipp and observed him drive around in a manner consistent with countersurveillance.  In other words, he seemed to be driving to avoid law enforcement detection as to his movements in the Saint Louis area.  The affidavit also discussed various investigative techniques and the necessity of making interceptions over TT#1 in view of those considerations.  Those considerations included details about review of police reports and records, analysis of phone toll records, air time summaries, pen register data, police surveillance and intelligence, actions by confidential informants and other communications between targets identified in the affidavit, including Shipp and Wright, and other known and unknown would be obtained through interception over TT#1.

The affidavit discussed tools and methods used in the investigation including witness interviews, use of confidential informants, undercover officers, search warrants and trash seizures, tracking devices, and analyzing cellular location data.  The affidavit explained in detail why such methods were likely to work or not.  Agent Wilmsmeyer's testimony was consistent with the affidavit and elaborated on these techniques and their use in this case.  The application

---

[5]Agent Wilmsmeyer testified at the hearing that Johnson was indicted in this judicial district as part of a separate case.

also explained the minimization protocol that would be used.  (Gov't Exh. 48).  Additionally, Agent Wilmsmeyer's testimony confirmed how the AUSA oversaw the minimization process and how agents complied with those instructions.

On July 26, 2017, AUSA Beth Orwick appeared before the Honorable John A. Ross, United States District Judge, and submitted an Application for Initial Interception of Wire and Electronic Communications over telephone number (314) 261-6568, which was referred to in the application, affidavit and order as Target Telephone #2 (TT#2) (Gov't Exhs. 54-56).  The application for TT#2 was accompanied by an affidavit of S/A Wilmsmeyer, which was signed and sworn to before Judge Ross on July 26, 2017.

Agent Wilmsmeyer's affidavit represented that he and a team were continuing an investigation of a heroin drug trafficking conspiracy involving Shipp, Wright and others.  The affidavit stated that communications between members of the conspiracy were expected over TT#2, which was used by Wright and subscribed to C. Right.  The affidavit included a detailed probable cause statement supporting the application, and a summary of some pertinent communications from the wiretap of TT#1 and additional events.  For example, controlled buys and subsequent cooperation of confidential informants, including CS#1 making a controlled buy on March 24, 2017, during which Wright questioned the CI in an unfriendly manner about how he or she obtained $500 to purchase heroin.  On April 20, 2017, Shipp was again present in the area where investigators observed a hand-to-hand drug transaction between CI#1 and a juvenile, who is a relative of Demetris Coleman, and working with the Shipp and Wright drug conspiracy.  The investigation identified Shipp as a source of heroin supply in the drug trafficking conspiracy and Wright as a supplier and enforcer for Shipp.  Both men were identified as likely to be intercepted over TT#2.  The affidavit also discussed various investigative techniques and the

necessity of making interceptions over TT#2 in view of those considerations. Those considerations included details about review of police reports and records, analysis of phone toll records, air time summaries, pen register data, police surveillance and intelligence, review of pole camera video, actions by confidential informants and other communications between targets identified in the affidavit, including Shipp and Wright, and other known and unknown would be obtained through interception over TT#2.

This affidavit discussed tools and methods used in the investigation including witness interviews, use of confidential informants, undercover officers, search warrants and trash seizures, tracking devices, and analyzing cellular location data. The affidavit explained in detail why such methods were likely to work or not, including the risk to personal safety. Specifically, prior attempts by police to interview individuals who had possible information were rebuffed. The affiant did not think that GPS monitoring would be helpful in building the investigation and identifying others involved. Agent Wilmsmeyer's testimony was consistent with and it elaborated on these techniques and their use in this case. The application also explained the minimization protocol that would be used. (Gov't Exh. 57). Agent Wilmsmeyer's testimony confirmed how the AUSA oversaw the minimization process and how agents complied with those instructions.

Finally, on October 20, 2017, AUSA Orick appeared before the Honorable Henry E. Autrey, United States District Judge, and submitted an Application for Initial Interception of Wire and Electronic Communications over telephone number (314) 574-0047 (TT#3), which was referred to in the application, affidavit and order as Target Telephone #3 (TT#3) (Gov't Exhs. 63-65). The application for TT#3 was accompanied by an affidavit of S/A Wilmsmeyer, which was signed and sworn to before Judge Autrey on October 20, 2017.

7

Agent Wilmsmeyer's affidavit represented that he and a team were investigating a heroin drug trafficking conspiracy involving Shipp, Wright and others.  The affidavit stated that communications between members of the conspiracy were expected over TT#3, which was used by Shipp and subscribed to AIT WIRELESS.  The affidavit included a detailed probable cause statement supporting the application, and a summary of some pertinent communications and events.  There are references to controlled buys and subsequent cooperation of confidential informants.  For example, Paragraph 31 stated:

> Toll data analysis was later conducted relative to incoming and outgoing contacts with Target Telephone #1 [used by T. Johnson as described above] in conjunction with the previously described heroin transaction on May 31, 2017.  Following the brief conversation with CS#2, during which time CS#2 placed the order for the one-half ounce of heroin from JOHNSON, Target Telephone #1 placed a very brief outgoing call to (314) 680-4300.  The interceptions of Target Telephone #1 have revealed that the user of (314) 680-4300, identified as Jimmie ROBINSON Jr. works in cooperation with JOHNSON and plays a pivotal role in JOHNSON's heroin trafficking activities.  The next contact with Target Telephone #1 (other than with CS#2) on May 31, 2017 was an outgoing text message to (314) 261-6568 (Target Telephone #2).  It should be noted that this text message was sent from Target Telephone #1 to Target Telephone #2 at approximately the same time that JOHNSON arrived on E. John Avenue, where SHIPP and his passenger were waiting.  Your affiant knows that during this time on this date (05/31/17), JOHNSON was in the process of picking up heroin in order to deliver the same to CS#2 and your affiant believes that this outgoing text message was contemporaneous to JOHNSON obtaining the heroin ….

The affidavit further explained the ongoing investigation of Shipp and Wright in the drug trafficking conspiracy, and who else might be expected to be intercepted over TT#3, in part as a result of intercepts over TT#2 between the two devices.  Paragraph 35 stated:

> During the Title-III interceptions of the wire and electronic communications occurring over Target Telephone #2, multiple voice calls and text messages were intercepted between Target Telephone #2 and Target Telephone #3.  On July 27, 2017, at approximately 9:34 PM, call session #78 was intercepted on Target Telephone #2.  This was an incoming call from SHIPP on Target Telephone #3….
>
> WRIGHT: "Yeah bro"

8

> SHIPP: "Did the lights go out?"
>
> WRIGHT: "I don't know...got some dope over there. Door closed on this mother fucker though."
>
> SHIPP: [Unintelligible]

The affidavit also discussed various investigative techniques and the necessity of making interceptions over TT#3 in view of a variety of considerations. Those considerations included details about review of police reports and records, analysis of phone toll records, air time summaries, pen register data, police surveillance and intelligence, actions by confidential informants and other communications between targets identified in the affidavit, including Shipp and Wright, and other known and unknown would be obtained through interception over TT#3.

This affidavit discussed tools and methods used in the investigation including witness interviews, use of confidential informants, undercover officers, search warrants and trash pulls, tracking devices, and analyzing cellular location data. The affidavit explained in detail why such methods were likely to work or not. Agent Wilmsmeyer's testimony was consistent with and it elaborated on these techniques and their use in this case. The application also explained the minimization protocol that would be used. (Gov't Exh. 57). Agent Wilmsmeyer's testimony confirmed how the AUSA oversaw the minimization process and how agents complied with those instructions. Thus, agents were able to "spin" their investigation from TT#1 to TT#2 in part because defendant Wright was intercepted over TT#1 in what agent's considered to be a "dirty call." (ECF No. 293, Transcript of Hr'g at 9, 19). Likewise, TT#3 was a spin from TT#2 in part because defendant Shipp was intercepted over TT#2.

As part of the ongoing investigation, Agent Wilmsmeyer testified that on March 24, 2017, DEA worked with a compensated confidential source who wore an audio recording device at the direction of agents. CS#1 worked previously with the Saint Louis Metropolitan Police

Department.  Agents gave detailed and specific instructions to CS#1 about how the device worked.  CS#1 also signed a DEA form that included a statement that cooperation with DEA could include being asked to wear a recording device.  CS#1 gave express consent to wearing and operating the recording device and knew that agents were monitoring the transaction.  The voices of numerous individuals within the organization were captured on the recording.  The same CS made a similar controlled buy on May 12, 2017.[6]  Agent Wilmsmeyer explained that one of the two confidential sources agreed to wear audio and video recording equipment. One confidential source, who worked previously with special agents from the Bureau of Alcohol, Tobacco and Firearms, had reservations about wearing a video-recording device but this person agreed to wear audio recording equipment.  The record is not clear which confidential source is referenced as part of this testimony.  [ECF No. 293, Transcript of Hr'g at 14, 28].

## DISCUSSION

I.   **Motions to Suppress Electronic Surveillance and Evidence of Pen Registers, Wiretaps and Electronic Communications of Any Nature and Supplemental Briefs [ECF Nos. 246, 251, 290, and 294]**

Shipp asks the Court to suppress all evidence obtained as a result of pen registers, wiretap orders, and electronic evidence of any nature.[7]  Wright raises similar sweeping arguments.  In

---

[6]Defendant Wright alleges that he has standing to challenge the recording made by CS#1 on March 24, 2017.

[7]Defendants Shipp and Wright makes no specific factual reference or legal challenge to the several pen register orders or PLWs obtained by the government as part of this case except that Shipp stated, "[n]o mention is made in some of the applications of any desire to use or install a pen register or Triggerfish device, yet apparently such components were sometimes used; installed and/or utilized without a proper order from this Court."  [ECF No. 251 at 4].  *See Smith v. Maryland*, 442 U.S. 735, 739-40, 743-44 (1979) (finding the installation and use of a pen register did not constitute a search because the defendant had no legitimate expectation of privacy in telephone numbers he dialed).  As discussed above, Agent Wilmsmeyer testified that a triggerfish device was used to ensure no inadvertent capture of devices by another person.

support, co-defendants Shipp and Wright both argue (1) the wiretap affidavits lack probable

cause; (2) the affidavits do not meet the statutory necessity requirements; (3) the agents failed to

properly minimize communications; and (4) there is a substantial basis for a hearing under

*Franks v. Delaware*, 438 U.S. 154 (1978).  Separately, Wright also argues that a recording of a

March 24, 2017 conversation between himself and a confidential informant (CI) working with

DEA special agents should be suppressed because no party consented to the recording of the

communication.  Shipp's post hearing briefs argue that he asked the government to disclose the

logs and recordings generated by the wiretap surveillance equipment and he has not received

those materials in discovery.  [ECF No. 290].  Finally, he moves for further pretrial inquiry about

whether DEA's use of a triggerfish device to identify various phones is sufficiently accurate.

Shipp argues that the allegation that he used multiple devices before a jury would be highly

prejudicial.

    The government views the motions as lacking in specificity and counters that the wiretap

affidavits are supported by probable cause, they satisfy the necessity requirement after it became

clear that traditional investigative techniques had apparent shortcomings, and investigators

conducted proper minimization standards.  Additionally, defendants have received all discovery

to which they are entitled, including so-called line sheets that contain transcripts of recording

communications.  Although the government concedes that some traditional investigative

measures employed by DEA were fruitful prior to seeking these wiretaps, conventional

investigatory techniques would not have exposed the scope of the entire drug trafficking

---

The government responded that the motions should be summarily denied because the arguments
are conclusory and based on conjectural terms and the motion does not comply with the Pretrial
Order entered in this case.  [ECF No. 259 at 4].  The government has responded that it does not
intend to raise these matters at trial unless defendants open the door to such evidence.   As such
the undersigned will only address the legal challenges raised about the wiretap evidence.

organization without obtaining these wiretaps.   As such Shipp and Wright have not shown that the wiretaps were not properly authorized.  The government further argues that Wright's challenge to the admissibility of the recorded communication made on March 24, 2017 is frivolous because the CI consented to the recording.

## II.    Applicable Legal Principles

### 1.    The Omnibus Crime Control and Safe Streets Act of 1968 (Title III)

Title III of the Omnibus Crime Control and Safe Streets Act of 1968, codified at 18 U.S.C. § 2510, *et seq*., allows the interception of wire, oral or electronic communications under certain circumstances.  If the required circumstances are satisfied, and upon proper application of a federal law enforcement officer who has been authorized to make such application by the United States Attorney General (or a lawful designee), an United States District Judge may enter an order authorizing electronic surveillance.  *See* 18 U.S.C. § 2518 (procedures of interception of wire, oral, or electronic communications).  Courts presume valid authorization unless an "aggrieved person" challenging the surveillance makes a prima facie showing that it was not so authorized.  *See* 18 U.S.C. § 2510(11) (defining an "aggrieved person" as someone who was a party to an intercepted wire, oral, or electronic communication or a person against whom the interception was directed).  Title III provides that an "aggrieved person" can move to suppress the contents of intercepted communications and evidence derived from those interceptions.  *See United States v. O'Connell*, 841 F.2d 1408, 1416 (8th Cir. 1988); *see also United States v. Radcliff*, 331 F.3d 1153, 1160 (10th Cir 2003).

Each wiretap application must include the following information:

**(a)** the identity of the investigative or law enforcement officer making the application, and the officer authorizing the application;

**(b)** a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i)

details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) a statement of the period of time for which the interception is required to be maintained. If the nature of the investigation is such that the authorization for interception should not automatically terminate when the described type of communication has been first obtained, a particular description of facts establishing probable cause to believe that additional communications of the same type will occur thereafter;

(e) a full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval of interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities or places specified in the application, and the action taken by the judge on each such application; and

(f) where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results.

18 U.S.C. § 2518 (1).  A wiretap order may issue upon a proper application if the District Judge determines:

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception;

(c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;

(d) [with certain exceptions] there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be

intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3).  With these statutory considerations in mind, courts will test the wiretap application materials in a "practical and commonsense fashion."  *United States v. Garcia*, 785 F.2d 214, 221 (8th Cir. 1986) (citations and quotations omitted).  Thus, "a reviewing court must accord broad discretion to the decision to authorize wiretapping …."  *Id.* (citations omitted). "Moreover, those against whom the resulting [wiretap] evidence is admitted have the burden of proving the wiretapping was unlawfully obtained or used."  *Id.* (citation omitted).  "[A] party challenging the validity of a federal wiretap order must show a substantial, not just technical, deviation from the requirements of the statute."  *United States v. Fairchild*, 189 F.3d 769, 774 (8th Cir. 1999) (citing *United States v. Moore*, 41 F.3d 370, 374-76 (8th Cir. 1994).

### 2.      Additional Probable Cause

Additionally, the usual requirements of the Fourth Amendment apply and are co-extensive with the Title III requirements.  The probable cause to support a wiretap affidavit "does not differ from that required by the fourth amendment for a search warrant."  *United States v. Macklin*, 902 F.2d 1320, 1324 (8th Cir. 1990); *see also United States Thompson*, 690 F.3d 977, 984-85 (8th Cir 2012).  "Issuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place."  *See also United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (citing *United States v. Jones*, 132 S. Ct. 945, 949 (2012)). "[O]nly that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause."  *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citations and quotations omitted).  Probable cause may be found in hearsay statements from reliable persons, *Gates*, 462 U.S. at 245, in hearsay statements from

confidential informants corroborated by independent investigation, *Draper v. United States*, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, *McDonald v. United States*, 335 U.S. 451, 454 (1948).Statements by eyewitnesses are also a reliable source to establish probable cause.  *United States v. Daigle*, 947 F.3d 1076, 1082 (8th Cir. 2020).

Upon review, a court "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant."  *United States v. DeFoggi*, 839 F.3d 701, 706 (8th Cir. 2016) (quotation omitted), *cert. denied*, 138 S. Ct. 2643 (2018); *see also United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019) (noting that the review is to determine whether the issuing judge "had a substantial basis for concluding that a search would uncover evidence of wrongdoing.")  (internal quotation and citation omitted).

### 3.    Necessity

Wiretaps applications must establish necessity.  The Title III necessity requirement ensures that investigators have tried normal investigative procedures and those measures failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.  See 18 U.S.C. § 2518(1)(c); *United States v. Turner*, 781 F.3d 374, 382 (8th Cir. 2015) (noting that the statute requires a wiretap application to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.").  As such a District Judge issuing a wiretap order "must find that 'normal investigative procedures' have failed or 'reasonably appear to be unlikely to succeed if tried or to be too dangerous.'"  *United v. West*, 589 F.3d 936, 939 (8th Cir. 2009) (quoting 18 U.S.C. § 2518(3)).

Wiretaps should not be "routinely" used "as the initial step in an investigation."  *Macklin*, 902 F.2d at 1326-27 (quoting *United States v. Thompson*, 210 F.3d 855, 858-59 (8th Cir. 2000). This requirement does not "mandate that the government 'exhaust all possible techniques before

applying for a wiretap.'" *United States v. Colbert*, 828 F.3d 718, 725 (8th Cir. 2016) (quoting *Macklin*, 902 F.2d at 1326-27 ("The government is simply not required to use a wiretap only as a last resort.").  If in the investigation of an alleged drug-trafficking conspiracy, "law enforcement officers are able to establish that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." *West*, 589 F.3d at 939 (citation and quotation omitted); *See also United States v. Milliner*, 765 F.3d 836, 840 (8th Cir. 2014).

The courts have recognized that the necessity requirement is not so strict that it must meet a hypertechnical or exacting standard.  A reviewing court must consider that a District Judge's "decision to authorize wiretapping" must be afforded 'broad discretion" *see Garcia*, 785 F.2d at 221.  Even the use of seemingly boilerplate language in an affidavit for a wiretap does not undercut an applicant's claim of necessity.  For example, "[a]n affidavit that explains "in general terms why some of the procedures have failed in other investigations and would likely fail in [the instant case]," satisfies § 2518(1)(c) if it contains 'particular instances in which normal procedures were used and did in fact fail.'" *Colbert*, 828 F.3d at 726 (quoting *Macklin*, 902 F.2d at 1327).  Likewise, an "affidavit's use of explanations that 'are common to most drug conspiracy investigations … does not necessarily preclude a finding of necessity under section 2518(1)(c).'" *Id.* (quoting *Thompson*, 210 F.3d at 859 (noting drug investigations can suffer from "common investigatory problems.")).  "Drug crime is necessarily harder to detect [and therefore to investigate] because it is difficult to witness and does not create victims who are compelled to come forward and report the crime." *United States v. Milliner*, No. 4:11 CR 263 RWS (TIA), 2013 WL 5105783 *6 (E. D. Mo. Sept. 12, 2013) *aff'd*, 765 F.3d 836 (8th Cir. 2014).  Drug conspiracies often involve numerous individuals who have convoluted roles and

16

responsibilities designed to confuse investigative efforts to identify the whole.  As a result, "a large drug conspiracy may be more difficult to fully prosecute without a wiretap, the scope of the investigation must be considered in determining necessity for the wiretap."  *Id.* (citing *United States v. Jackson*, 345 F.3d 638 (8th Cir. 2003)); *United States v. Smith*, 909 F.2d 1164, 1166 (8th Cir. 1990).  Thus, it is well established that if the government shows "that conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied." *Turner*, 781 F.3d at 382 (quoting *West*, 589 F.3d at 939).

### 4.    Minimization

The minimization requirement of Title III serves to limit the scope of the searching and seizing of communications over the target device.  In other words, law enforcement officers are duty-bound to take steps to minimize communications that are not subject to the wiretap order. See U.S.C. § 2518(5).  Although he offers no statistical analysis, Defendant Ship argues that minimization protocols were not followed in this case because the percentage of calls minimized is "relatively nominal."  [ECF. No. 259 at 4].  There is no blanket standard in this Circuit.

Indeed, there is no single way by which law enforcement must appropriately minimize nonpertinent interceptions and there are no mandates in this Circuit about percentages of calls to be minimized to signal a violation.  *West*, 589 F.3d 936 at 939.  Periodic spot checking is considered a reasonable means of minimizing conversations in recognition that some communications may contain some pertinent and nonpertinent content.  *United States v. Ozar*, 50 F.3d 1440, 1448 (8th. Cir. 1995).  *See also United States v. Smith*, 909 F.2d 1164, 1167 (8th Cir. 1990) (considering that the court's analysis of a minimization challenge turns on the reasonableness of the agents' actions).  Compliance is determined by the reviewing court upon

17

applying an objective reasonableness standard.  *See United States v. Williams*, 109 F.3d 502, 507 (8th Cir. 1997).  In *Macklin*, the Eighth Circuit explained,

> In considering whether the government's conduct was reasonable, the reviewing court must consider a variety of factors including the scope of the enterprise, the agent's reasonable expectation of the content of a call, the extent of judicial supervision, length and origin of a call, and the use of coded or ambiguous language…. More extensive wiretapping is reasonable when the investigation focuses on determining the scope of a widespread conspiracy…. The same is true when the conversations are in the jargon of the drug trade…. Thus, the government's conduct could be reasonable even if the total number of conversations intercepted contained a high percentage of nonpertinent calls….

902 F.2d at 1328 (emphasis supplied, internal citations omitted).

In weighing whether the government's conduct was reasonable, the reviewing court must consider a variety of factors including the scope of the enterprise, the agent's reasonable expectation of the content of a call and all relevant circumstances.

### 5.    Consensual recordings

Wright further argues that on March 24, 2017 a government informant recorded a communication with him and the recording is illegal because there was no consent. **"**[I]t is well-established that a law enforcement officer or informant may record conversations between himself and another person without violating the Fourth Amendment or any other law," when the facts show that the government informant had full knowledge of the recordings and with his or her consent. *United States v. Kuchta*, No. 4:04CR479 ERW/TIA, 2011 WL 1870455, at *2 (E.D. Mo. April 28, 2011) (citing *United States v. Sileven*, 985 F.2d 962 (1983); *United States v. White*, 401 U.S. 745, 752 (1971)); 18 U.S.C. § 2511.  There is no Fourth Amendment violation so long as the informant knows that the government is recording the conversation. *United States v. Tangeman*, 30 F.3d 950, 952 (8th Cir. 1994).  The government bears the burden of establishing that consent is voluntary and such consent can be established by showing under the totality of the

circumstances that the informant was aware the communication was monitored at the time he or she participated.

## III.    Analysis of Legal Challenges to TT#1, TT#2 and TT#3

*Conclusions regarding probable cause*

The record reflects that the required procedures for authorization, reporting and sealing in support of the affidavits issued in this case were properly followed.[8]  The affidavits also recite sufficient probable cause.

In addition to the facts discussed above, Wilmsmeyer's affidavits for TT#1 and TT#2 contain information from corroborated confidential informants.  The reliability of each one is attested in the affidavits.  Information provided by CS#2 led to the identification of Travis Johnson and TT#1, over which defendant Wright was intercepted and which was part of the probable cause to apply for the wiretap for TT#2.  Later, Shipp was intercepted over TT#2 in communications relevant to the investigation.  As discussed above, on April 20, 2017, a confidential source made a controlled buy of heroin from a juvenile who indicated that Shipp was his source of supply for heroin.  TT#3 also contains information about a third confidential informant who had personal dealings with Shipp.  On August 18, 2017, CS#3 approached Shipp on the street in the vicinity of 4748 St. Louis Avenue where much of the investigation surveillance occurred and DEA observed suspected drug transactions during this investigation. CS#3 made a controlled delivery of $300 to pay for a prior drug debt directly to Shipp while at the same time arranging an additional controlled buy of heroin from Demetris Coleman on

---

[8]The listed target offenses are violations of 21 U.S.C. § 841(a)(1) (distribution and possession with the intent to distribute a controlled substance; 21 U.S.C. § 843(b) (use of a communication facility to facilitate the commission of a felony drug offense); 21 U.S.C. § 846 (drug-trafficking conspiracy); 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime); 18 U.S.C. § 922(g) (felon in possession of a firearm); and 18 U.S.C. §§ 1956 and 1957 (money laundering).

August 18, 2017. DEA conducted surveillance of these matters. Much of the information relayed by the confidential sources was corroborated by other techniques including pen register, physical surveillance and by pole camera. The undersigned concludes that after reviewing the three affidavits and the applicable law, each of the district judges "had a substantial basis" to believe the targets of the investigation named were engaged in or discussing the target offenses. *Illinois v. Gates*, 462 U.S. at 236.The pertinent communications about those drug-trafficking related offenses and other crimes would likely be obtained through the interceptions requested in the three wiretaps. Defendants' argument on this point should be denied.

*Conclusions regarding necessity*

Upon review of the affidavits and in consideration of the arguments raised, the undersigned finds there are sufficient facts to provide more than a substantial basis for the issuing District Judges to conclude that the government met the legal necessity requirement. The record reflects that the government employed many of the traditional prerequisite techniques prior to seeking a wiretap. *See Colbert*, 828 F.3d at 725. The wiretaps were not used by law enforcement to launch this investigation as an initial step. The affidavits set forth detailed explanations of the use of surveillance, trash pulls, grand jury subpoenas, search warrants, confidential informants, other judicial-approved intercepts; the analysis of phone records and human source interviews, and decisions to avoid the use grand jury subpoenas because of the potential danger or exposure. The wiretap affidavits discuss the limitations of using CS#1 for large purchases of heroin and Agent Wilmsmeyer noted in the affidavit supporting the order for TT#2 that Wright questioned CS#1 about the source of funds for a $500 heroin purchase from a juvenile in the organization. Shipp's conclusory arguments that "normal investigatory procedures worked fine" and "normal surveillance … was possible and practicable," are not

persuasive. [ECF No. 251 at 4]. Specific statements are made that supported the government's position that wiretap evidence could expose the larger conspiracy. *See Turner*, 781 F.3d at 382. The District Judges who issued the wiretap applications, affidavits and orders considered and credited the representations made by the affiants as to the necessity of using the wiretaps.

Finally, to the extent that Defendants' alternatively argue that Agent Wilmsmeyer reached the necessity requirement by making false statements or omissions, Shipp and Wright have not made a substantial preliminary showing in asking this court to hold a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978) because the affidavits are supported by probable cause as discussed above.[9] This request is denied.

*Conclusions regarding minimization*

Neither Shipp nor Wright point to specific instances of failure to comply with the minimization requirements and the record reflects that the steps taken by the government sufficed. Each of the wiretap orders include specific directives about minimization. "IT IS ORDERED FURTHER … that all monitoring of a wire and electronic communications shall be conducted in such a way as to minimize the interception and disclosure of the communications intercepted to those communications relevant to the pending investigation." (*See, e.g.*, Gov't Exh. 47). The government has also provided copies of the minimization letters directed to all

---

[9]A defendant is not automatically entitled to an evidentiary hearing under *Franks* because affidavits carry a "presumption of validity… and conclusory allegations of false or omitted information are insufficient" *Id.* at 171. A defendant must make a substantial preliminary showing that a material statement in a search warrant affidavit was made by the affiant with reckless disregard for whether the statement was true or was a deliberate falsehood and the false statement or omission was necessary to the probable cause finding. *See United States v. Gater*, 868 F.3d 657, 659-60 (8th Cir. 2017). Mere negligence or innocent mistake is insufficient to void a search warrant. *Franks*, *supra*, 438 U.S. at 171. *See also United States v. Gonzalez*, 781 F.3d 422, 431 (8th Cir. 2015) (denying defendant's claims that omissions from the search warrant affidavit were material where defendant failed to show that the omitted material was "clearly critical" to the probable cause determination).

monitoring agents that sets forth strict instructions about procedures to follow.  (*See, e.g.*, Gov't Exh. 48).  The letters include detailed descriptions of categories of privileged communications to be minimized and other guidance and requires that the supervising agent report daily to the AUSA.  The government also held minimization meetings to reinforce the written guidance and ensure that each person monitoring knew the rules.  Monitors were required to read the wiretap application, affidavit, and order with the minimization letter and sign a log certifying the same.  Agent Wilmsmeyer testified consistently with this documentary evidence and he demonstrated the steps taken to comply, including how the AUSA advised the persons who would monitor the wiretap.  These procedures complied with the requirements under Title III and the judicially-authorized wiretap orders and they were extensive and meaningful.

Shipp further claims that the agents acted improperly to the extent that they failed to generate daily logs or produce daily reports.  He does not point to any law to support this nuanced argument and the undersigned is not aware of law that supports his position.  Even if there was a specific infirmity that Shipp or Wright could point to, it is doubtful such a claim would result in suppression.  The law of this Circuit has long held that the appropriate remedy for a failure of the minimization requirement is not the suppression of all intercepted communications.  Rather, the appropriate remedy is the suppression of the specific communications that should have been, but were not, minimized.  *See United States v. Cox*, 462 F.2d 1293, 1301 (8th Cir. 1972); *see also United States v. Ozar*, 50 F.3d 1440, 1448 (8th Cir. 1995) (reversing suppression of wiretap evidence for failure to minimize privileged calls).  Shipp has not identified any specific communications that should have been, but were not, minimized.  There is no other evidence in the record to support his argument.  The undersigned finds that the

steps taken to minimize during interceptions over the three wiretaps were reasonable and adequate and this point should be denied.

*Conclusions regarding informant recording*

The evidence at the hearing revealed that CS#1 consented to the audio recording made on March 24, 2017.  Based on the above, the undersigned concludes that the recording of the conversation between Wright and CS#1 was lawful when recorded and monitored by the DEA. *Tangeman*, 30 F.3d at 952.   This evidence should not be suppressed.

Finally, to the extent that Shipp requests an opportunity for further hearings on these matters because he asks for additional material and the government has responded that defendants have received all discoverable material under Federal Rule of Criminal Procedure 12(b)(4), his motion is denied.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Leroy Shipp's Motion to Suppress Evidence of Pen Registers, Wiretaps and Electronic Communication of any Nature (Doc. #251); and Defendant Stephon Wright's Motion to Suppress Electronic Surveillance (Doc. #246) be DENIED.

The parties are advised that they have fourteen (14) days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to timely file objections may result in the waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990).

    /s/ Noelle C. Collins
NOELLE C. COLLINS
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of July, 2020.